O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE MARSHBURN, | Case No. 2:14-cv-00242-CAS (PJWx) |
| Plaintiff(s), | |
| vs. | FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: BENCH TRIAL HELD ON DEFENDANT'S ERISA PREEMPTION DEFENSE |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, ET AL., | |
| Defendant(s). | |

**I.     INTRODUCTION**

On December 4, 2013, plaintiff Julie Marshburn, M.D., filed this lawsuit against defendant Unum Life Insurance Company of America ("Unum") and Does 1 through 10. On January 10, 2014, Unum removed the action to this Court on the basis of diversity and federal question jurisdiction. Dkt. Nos. 1, 8. In brief, the complaint alleges that Unum failed to make disability payments owed to plaintiff under the terms of an insurance policy issued by Unum, having improperly determined that plaintiff was not disabled. See generally Compl. (attached to Dkt. No. 8). Plaintiff alleges claims under California law for breach of contract and breach of the duty of good faith and fair dealing. Id.

/ / /

On December 8, 2014, Unum filed a motion seeking summary judgment on the ground that the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), governs plaintiff's claims for long-term disability benefits. Dkt. No. 20. Unum argued that plaintiff was ineligible to convert her ERISA-governed, employer-affiliated group policy to an individual policy governed by state law because she was already disabled at the time of conversion, and that as a result, her claims under the state-law-governed policy are preempted and she could proceed, if at all, only by making a claim for benefits under the ERISA plan. On January 5, 2015, the Court held a hearing on the matter, and concluded that ERISA governs the ineligibility defense raised by Unum, but that Unum had not shown that it was entitled to summary judgment on that defense. Dkt. No. 30. Unum's ERISA-based defense was tried to the Court on June 11, 2015. Michael Horrow and Nichole Podgurski of Donahue & Horrow LLP appeared for plaintiff, and Keiko Kojima and Daniel Maguire of Burke, Williams & Sorensen LLP appeared for Unum. Dkt. No. 38.

Subsequently, the Court requested supplemental briefing on several legal issues. Dkt. No. 41. The parties filed their supplemental briefs on July 13, 2015. Dkt. Nos. 44, 45. Having carefully considered the evidence and the parties' arguments, the Court finds and concludes as follows.

## II.   FINDINGS OF FACT

1. After graduating from medical school in 2003, plaintiff was admitted to a three-year internal medicine residency program at Cedars-Sinai Medical Center in Los Angeles, California ("Cedars-Sinai"). Trial Tr. 19:19-22, 20:10-12. The residency program consisted of a series of clinical "rotations," the purposes of which included attaining proficiencies in various medical procedures. Id. 42:14–43:10; 68:12-18. There were thirteen blocks of rotations in each year of plaintiff's residency. Id. 44:7-10. Some rotations were required for completion of the residency program; others were elective. Id. 43:17-21; 78:15-18.

///

### A.     Unum's Relevant Insurance Policies

2. Cedars-Sinai maintained an employee welfare benefit plan (the "Plan") for its eligible employees. Dkt. No. 20-1 ¶ 5. Effective February 1, 1997, Unum issued Group Long Term Disability Policy No. 510733001 (the "Group Policy"), which funded in part the Plan's long-term disability insurance coverage. Id.; see generally Trial Ex. 1. As a resident at Cedars-Sinai, plaintiff was eligible to participate in the Plan and for disability coverage under the Group Policy. Dkt. No. 20-1 ¶ 7.

3. For purposes of short-term disability benefits, the Group Policy defines "disability" as when, "due to your sickness or injury . . . you are unable to perform the material and substantial[1] duties of your regular occupation;[2] and [] you are not working in any occupation." Trial Ex. 1 at 19. For purposes of long-term disability benefits, the Group Policy defines "disability" as when "you are limited[3] from performing the material and substantial duties of your regular occupation due to your sickness and injury; and [] you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." Id. at 24.

4. The Group Policy had a "conversion" feature that allowed an employee whose employment was terminated to retain long-term disability insurance coverage as an

---

[1]The Group Policy defines "material and substantial duties" as "duties that . . . are normally required for the performance of your regular occupation; and [] cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week." Trial Ex. 1 at 46.

[2]The Group Policy defines "regular occupation" as follows: "the occupation you are routinely performing when your disability begins." Trial Ex. 1 at 47. The Group Policy notes that "Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at least a specific location." Id.

[3]The Group Policy defines "limited" as "what you cannot or are unable to do." Trial Ex. 1 at 46.

individual.[4] The explanation of these conversion benefits is included in the Group Policy as a subheading under the heading "Long Term Disability[:] Other Benefit Features." Trial Ex. 1 at 33–34. This provision reads:

> If you end employment with your Employer, your coverage under the plan will end. You may be eligible to purchase insurance under Unum's group conversion policy. To be eligible, you must have been insured under your Employer's group plan for at least 12 consecutive months. . . . You must apply for insurance under the conversion policy and pay the first quarterly premium within 31 days after the date your employment ends. Unum will determine the coverage you will have under the conversion policy. The conversion policy may not be the same coverage [Unum] offered you under your Employer's group plan.

Id. at 34 (paragraph structure altered). The Group Policy explains that a person is "not eligible to apply for coverage under Unum's group conversion policy if," among other things, the person is "disabled under the terms of the plan." Id.

### B. Plaintiff's Residency, Injury, and Medical Treatment

5. In August 2003, while working at Cedars-Sinai, plaintiff injured her right shoulder while lifting a patient. Trial Tr. 22:17-23. Plaintiff was initially told that the injury was a sprain, and then a nerve injury, and that it would heal over time. Id. 24:17-25. Although plaintiff did not miss any work because of the injury, id. 23:13-15, the injury did not heal on its own, and a doctor placed plaintiff on work restrictions in late 2005 or early 2006, id. 25:1-5. Although these work restrictions altered the selection of rotations plaintiff planned to undertake, they did not prevent her from completing the

---

[4] As used in this order, "conversion policy" means "a private (non-employer-financed) insurance policy obtained by a former employee, after termination." Demars v. CIGNA Corp., 173 F.3d 443, 445 n.1 (1st Cir. 1999)

rotations required to finish her residency, or completing the rotations to which she was assigned. Id. 25:14–26:10.

6. Plaintiff was eventually referred to a surgeon named Dr. Neal S. El-Attrache, whom she saw in February 2006. Id. 23:19–24:6. On June 5, 2006, Dr. El-Attrache performed surgery on plaintiff's right shoulder to repair a labrum tear. Id. 27:5-8. During this surgery, plaintiff suffered a torn ligament in her right thumb. Id. 54:7-12. Following the surgery, Dr. El-Attrache placed additional work restrictions on plaintiff, prohibiting her from pushing, pulling, or lifting with her right upper extremity. Id. 52:11–53:2; Trial Ex. 22 at 157. Some procedures that a resident must learn to complete the internal residency program require significant use of both hands such that plaintiff would have been unable to complete those rotations while under Dr. El-Attrache's post-surgery restrictions. Trial Tr. 53:10-15; 80:19–81:16.

7. At the time of her surgery, plaintiff was in a "reading rotation," an elective rotation that allows a student to study instead of undertaking a traditional medical rotation. Id. 27:12-21; 73:3-5. A person undertaking a reading rotation is still considered an internal medicine resident. Id. 79:5-13; 83:24–84:1. Dr. Mark Noah, the internal medicine residency director at Cedars-Sinai, has responsibility for deciding whether a resident can take a reading rotation. Id. 21:22–22:3, 29:17-22; 74:3-11. Whether a resident undertakes a reading rotation is largely based on the results of a practice examination given during the third year of residency. Id. 71:7–72:16; 73:7-13. Other factors can bear on the decision to offer a resident a reading rotation, including a resident's maternity leave or recovery from surgery. Id. 83:15-23. Such a rotation can be done at any time during the third year of residency, but is usually done toward the end of that year, closer to the examination. Id. 74:12-19. Other residents had reading months while plaintiff was at Cedars-Sinai. Id. 29:23–30:4; 74:23-25.

8. During her own reading rotation in June 2006, plaintiff was studying for her internal medicine board examination; she testified that she had done poorly on practice tests for those boards. Id. 27:22-24, 28:16-18. Plaintiff was still paid her full salary

5

while on this reading rotation. Id. 28:19-23. Plaintiff continued to study after her residency with Cedars-Sinai ended on June 30, 2006. Id. 28:24–29:1, 30:4-9. In August 2006, plaintiff took and passed her internal medicine boards with a high score. Id. 27:25–28:11.

9.  While she was a resident at Cedars-Sinai, plaintiff received permanent partial disability worker's compensation benefits; however, she worked during the entire period she was receiving such benefits, and still received her full salary. Id. 30:14–31:1, 31:8-9. The Unum employees investigating plaintiff's later disability claim were aware that plaintiff had received worker's compensation benefits. Boothby Dep. 62:11–63:6, Jan. 29, 2015; King Dep. 101:16-20, 102:17-19, Jan. 28, 2015. On June 13, 2006, the company that administered plaintiff's worker's compensation claims sent her a letter stating that plaintiff had "advised our office not to pay you benefits for the month of June as your employer will be continuing your salary." Trial Ex. 26. Plaintiff never received temporary disability worker's compensation benefits while she was a resident at Cedars-Sinai. Trial Tr. 31:2-5. Plaintiff received temporary disability worker's compensation benefits from July 1, 2006 until March 2008, when she returned to work as a physician. Id. 57:21-23, 59:4-7, 60:9-12.

### C.  Plaintiff's Insurance Policies with Unum

10.  Plaintiff bought a disability insurance policy while she was a resident at Cedars-Sinai. Id. 31:17-20. As stated, plaintiff's employment at Cedars-Sinai terminated on June 30, 2006. Trial Ex. 9. Cedars-Sinai subsequently sent plaintiff a document notifying her of the opportunity to convert her Unum disability insurance coverage into an individual policy, along with an application for conversion coverage. Trial Tr. 31:21–32:4. This notice was dated July 7, 2006, but plaintiff recalls receiving it in late July. Trial Ex. 6 at 1; Trial Tr. 32:5-7. The "Application for Conversion of Long Term Disability Insurance," attached to the aforementioned notice, stated: "If you are currently disabled under the terms of your group policy, you should apply for disability benefits not conversion." Trial Ex. 7 at 1. The only information required by

this application was (1) name, (2) sex, (3) Social Security number, (4) address, (5) date of birth, (6) group long-term disability plan policy number, and (7) a selection between a "standard option" with a maximum monthly benefit of $4,000 and a "higher maximum option" with a maximum monthly benefit of $6,000, which option was "only available upon completion of an Application and Evidence of Insurability form." Id.

11. Plaintiff filled out the application, dating her signature August 11, 2006 and enclosing a check for the first quarterly premium. Id. She did not volunteer any information other than the information requested by the application, as detailed above. Unum initially denied plaintiff conversion coverage, notifying plaintiff through an August 28, 2006 letter that her application was rejected because it was received beyond the 31-day conversion period. Trial Ex. 8. Plaintiff then called Unum and explained that her application was late because she did not receive the notice in a timely manner. Trial Tr. 37:6-11. Cedars-Sinai certified in writing that due to the hospital's error, the conversion notice had been mailed out late. Trial Ex. 9. On September 19, 2006, plaintiff sent this certification from Cedars-Sinai along with her application and check. Trial Ex. 10. Unum subsequently processed and approved plaintiff's application, issuing her a "Long Term Disability Benefits Conversion Certificate" effective June 30, 2006 under Plan No. 152761-001 BL0102825 (the "Conversion Policy"). Trial Exs. 2, 11. Plaintiff regularly paid quarterly premiums for the Conversion policy beginning in 2006. Trial Tr. 38:19–39:3.

12. Under the Conversion Policy, an insured must "meet the definition of 'participant' " to be eligible for coverage. Trial Ex. 2 at 8. The Conversion Policy defines "participant" as a "person who is eligible for long term disability conversion coverage according to the terms and provisions of the former plan." Id. at 5.

### D. Plaintiff's Disability Claim

13. In January 2011, plaintiff submitted a long-term disability claim under the Conversion Policy, stating that she was unable to work as of February 27, 2009, and that her last date of work was April 14, 2009. Trial Ex. 13 at 1, 3. She cited injuries to

her right shoulder in August 2003 and 2010, her right thumb in June 2006, her left thumb in December 2006, and her right index finger in May 2007. Plaintiff also mentioned various other injuries presenting after a February 2010 surgery, and insomnia, depression, and chronic headaches related to the aforementioned injuries. Id. at 2. Plaintiff claimed that she was unable to perform tasks including handling charts, completing paperwork, typing, writing, conducting physical exams, and performing various procedures, and also noted that she was on daily opioid medication that prevented her from working. Id. at 3.

14. While her claim was being processed, plaintiff told the Unum employee primarily responsible for handling her claim that her first shoulder surgery was in June 2006. Boothby Dep. 42:10-12. Notes from plaintiff's claims file indicate that plaintiff left a voice mail with a claims specialist at Unum stating that plaintiff was "totally disabled" during the period July 1, 2006 to early March 2008. Trial Ex. 23. Additional notes in plaintiff's claim file indicate that plaintiff told the claims specialist words to the effect of "I was on disability in 2006 when I had my first shoulder surgery." Trial Ex. 14 at 2. The same notes indicate that when the claims specialist asked the follow-up question, "[W]ere you disabled when you left Cedars-Sinai?" plaintiff responded that her "residency was over basically. It overlapped a little but they let me have the last time to get the surgery done." Id.; see also Boothby Dep. 58:22-59:11.

15. In a letter dated June 20, 2011, Unum approved plaintiff's disability claim with a start date of April 15, 2009, and noted that the insurer was requesting additional medical records to determine future benefits. Trial Ex. 15. Unum never investigated whether plaintiff was totally disabled prior to 2009. King Dep. 93:14-18. As far as the supervisor ultimately in charge of approving or denying plaintiff's claim is aware, Unum never attempted to determine whether plaintiff was disabled under the terms of the Group Policy at the time of her conversion. Id. 217:5–218:5.

16. By letter dated June 1, 2012, Unum informed plaintiff that it had decided to discontinue her long-term disability benefits because it had "determined that [she was]

able to perform the duties of other gainful occupations, and no longer [met] the definition of disability as outlined under the policy." Trial Ex. 17 at 1–2. Plaintiff submitted an appeal supported by additional records on November 26, 2012, which was rejected on April 16, 2013. Trial Exs. 18, 19. Unum advised plaintiff in a letter dated November 7, 2013, that no further review of her claim was available. Trial Ex. 20.

17. To the extent necessary, each of these findings of fact may be deemed to be a conclusion of law.

## III. CONCLUSIONS OF LAW

### A. ERISA Governs the Right to Convert

In the Ninth Circuit, ERISA governs the right to convert an ERISA-governed policy to an individual conversion policy, but not conversion policies themselves. See Waks v. Empire Blue Cross/Blue Shield, 263 F.3d 872, 877 (9th Cir. 2001). By contrast, "state-law claims arising under a converted policy—even though the policy has been converted from an ERISA plan—are not preempted by ERISA." Id. Accordingly, the Court looks to ERISA to determine whether plaintiff validly converted her group policy to a conversion policy. See White v. Provident Life & Accident Ins. Co., 114 F.3d 26, 28 (4th Cir. 1997).

### B. Unum Bears the Burden of Proof.

Because Unum raised the issue of ERISA preemption and ineligibility to convert as affirmative defenses, Unum bears the burden of proof on those issues. See Kanne v. Conn. Gen. Life Ins. Co., 867 F.2d 489, 492 n.4 (9th Cir. 1988) ("Because Connecticut General's claim of ERISA preemption is a federal defense in this lawsuit, [citation], the burden is on the defendant to prove the facts necessary to establish it."); Access Mediquip L.L.C. v. United Healthcare Ins. Co., 662 F.3d 376, 378 (5th Cir. 2011) ("ERISA preemption is an affirmative defense which must be proven by the defendant at trial."); Great-West Life & Annuity Ins. Co. v. Info. Sys. & Networks Corp., 523 F.3d 266, 270 (4th Cir. 2008) ("As ISN seeks to use ERISA pre-emption as an

affirmative defense to Great-West's state law claims, ISN bears the burden of proving the defense's applicability.").[5]

Unum must prove that plaintiff was disabled under the relevant terms of the plan on June 30, 2006, because that is when (1) her Group Policy coverage ended, Trial Ex. 1 at 17; and (2) her Conversion Policy was made effective, Trial Ex. 2.[6]

### C. The "Long-Term Disability" Definition Applies.

The parties dispute which definition of "disability" contained in the Group Policy—"short-term disability," or "long-term disability"—should apply in determining whether plaintiff was disabled at the time her Conversion Policy was made effective. As stated, the long-term disability definition, unlike the short-term disability definition, requires that an individual have a "20% or more loss in [her] indexed monthly earnings due to the same sickness or injury."

"Courts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.' " U.S. Airways, Inc. v. McCutchen, 133 S. Ct. 1537, 1549 (2013) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989)). When the words of a plan "leave gaps," a court "properly takes account of background legal rules—the doctrines that typically have governed a given situation when no agreement states otherwise." Id. (citing Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan v. Wells, 213 F.3d 398, 402

---

[5]None of the cases Unum cites for the proposition that plaintiff bears the burden of proof because she must establish eligibility for coverage involve an affirmative defense, asserted ERISA preemption of state law claims, or whether a conversion policy was properly issued. They largely involve inapposite situations in which either (1) a claimant bore the burden of proving the occurrence of a covered loss, or (2) a claimant appealed the denial of ERISA benefits. Nevertheless, because the key facts are not in dispute and this order turns on an issue of contract interpretation, placing the burden on plaintiff instead would not change the outcome.

[6]Unum does not appear to argue that a different date should be used. See Unum Trial Br. at 11 (arguing that plaintiff "is disqualified from conversion coverage because she was disabled as of June 30, 2006—the Conversion Policy effective date").

(7th Cir. 2000) ("[C]ontracts . . . are enacted against a background of common-sense understandings and legal principles . . . that operate as default rules to govern in the absence of a clear expression of the parties' [contrary] intent.")).

The Group Policy states that a covered individual is "not eligible to apply for coverage under Unum's group conversion policy if," among other things, she is "disabled under the terms of the plan." Trial Ex. 1 at 34. The Group Policy does not state whether "disabled under the terms of the plan" refers to the definition listed for short-term disability benefits, long-term disability benefits, or both. However, the explanation of conversion benefits—including the eligibility language—is placed under the heading "Long Term Disability Other Benefit Features." Id. at 33. This suggests that the disability definition applicable to long-term benefits should apply.

Additionally, the conversion certificate plaintiff was issued refers to "conversion of your Long Term Disability Insurance held under your former employer's plan." Trial Ex. 11. And important terms of the Conversion Policy—for example, the provision of benefits until age sixty-five, with an elimination period of 180 days—mirror those of the Group Policy's long-term disability benefits. Compare Trial Ex. 2 at 3, with Trial Ex. 1 at 6–7. These contextual details also indicate that the long-term disability definition, not the short-term disability definition, is the appropriate reference point.

At the very least, the Group Policy is ambiguous as to which definition of disability should be used, leaving a gap which the Court may consult background legal principles to fill. See McCutchen, 133 S. Ct. at 1549. A well-established principle of insurance law provides that if an "insurance contract is fairly susceptible of two different interpretations . . . the interpretation that is most favorable to the insured will be adopted." Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 538–39 (9th Cir. 1990). The Ninth Circuit has applied this "rule of *contra proferentem*" in an ERISA case, noting that the doctrine is accepted in every state for the "good reason" that insurance policies "are almost always drafted by specialists employed by the insurer,"

11

so that the "insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand. Id. at 540. "[I]f it fails to do this," the court explained, "it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence." Id. at 540. Accordingly, the Ninth Circuit has held that "regardless or whether it applies as a matter of uniform federal law or because federal law incorporates state law," *contra proferentem* can be applied to guide the construction of an ambiguous term in an ERISA plan. Id. This principle further supports the Court's conclusion that the Group Policy's definition of "long-term disability" should govern whether plaintiff's Conversion Policy was properly issued.[7]

### C. Plaintiff Was Not Disabled Under the Terms of the ERISA Plan On June 30, 2006.

As stated above, plaintiff received her full salary through the end of her employment with Cedars-Sinai on June 30, 2006. Therefore, she never suffered a "20% or more loss in [her] indexed monthly earnings," so as to meet the definition of "disabled" for purposes of long-term disability benefits. Because the Court has determined that the long-term disability definition governs, plaintiff was not disabled as

---

[7] Unum argues that plaintiff was ineligible to convert if she met either definition of "disabled," because the contrary position "would result in the anomalous situation" where an individual collecting short-term disability benefits could convert to an individual policy, thereby receiving benefits under both policies—which is prohibited by the Group Policy and the Conversion Policy. Unum Trial Br. at 10–11. But because plaintiff never collected short-term disability benefits under the Group Policy, that hypothetical is not before the Court. In any event, the Court does not find that possible conflict of policy terms sufficient to overcome the factors cited above, which at minimum show that the applicable disability definition is an ambiguity that should be resolved against the insurer and drafter in the case at bar. Moreover, Unum's position would produce an "anomalous situation" in this case: if plaintiff were disabled for purposes of short-term disability benefits on June 30, 2006 and for that reason ineligible to apply for conversion coverage, but not eligible for long-term disability on that date because she had suffered no loss of income, plaintiff would not be eligible for any long-term disability benefits or policy. This inequitable result makes Unum's position that the Court should dismiss this suit so that plaintiff can file a claim for benefits under the Group Policy, see id. at 14–15, ring hollow.

of June 30, 2006, her conversion policy was not improperly issued, and ERISA does not preempt her state law claims.

### D. Plaintiff Is Not Judicially Estopped from Arguing That Her Conversion Policy Was Properly Issued.

Unum argues that plaintiff should be judicially estopped from arguing that she was not disabled under the terms of the policy at the relevant time because of her receipt of worker's compensation benefits starting on July 1, 2006. See Unum Supp. Trial Br. at 12–14. Judicial estoppel " 'prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000)). This doctrine is an equitable one, to be " 'invoked by a court at its discretion.' " Id. at 750 (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)). The Supreme Court has directed courts to consider (1) whether the party's "later position [is] 'clearly inconsistent' with its earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 750–51 (citations omitted).

The Court declines to apply judicial estoppel here. Plaintiff received "temporary disability" benefits starting July 1, 2006, See Trial Ex. 25 at 2, but there is no record of what representations plaintiff made to her worker's compensation carrier to obtain those benefits. Therefore, there is no evidence that would enable the Court to conclude that those representations were "clearly inconsistent" with her current position that she was not disabled under the terms of the Group Policy as of June 30, 2006. The fact that plaintiff received temporary disability benefits, without more, is insufficient for the Court to draw such a conclusion. See Jackson v. Count of Los Angeles, 60 Cal. App. 4th 171, 188 (1997) (explaining that a "person may be 'totally disabled' for worker's

compensation purposes and yet still be able to perform a position's essential functions with or without reasonable accommodation").

To the extent necessary, each of these conclusions of law may be deemed to be a finding of fact.

## IV. CONCLUSION

Based on the above findings of fact and conclusions of law, the Court concludes that plaintiff was not ineligible for the Conversion Policy that forms the basis of her state law claims.[8] Therefore, Unum's affirmative defense of ERISA preemption fails.

Dated: August 6, 2015

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE

---

[8] Because the Court resolves this issue in plaintiff's favor, the Court does not reach plaintiff's arguments (1) that Unum waived its ineligibility defense by failing to raise it before this litigation or (2) that the Court's previous finding that California incontestability law did not defeat Unum's affirmative defense was erroneous.